UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

DEBBEE L. CARLSON,                          Civil No. 09-2547 (DWF/LIB)

        Plaintiff,

v.                                          **REPORT AND**
                                            **RECOMMENDATION**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

---

Plaintiff Debbee Carlson seeks judicial review of the decision of the Commissioner of

Social Security ("Commissioner") denying her application for disability insurance benefits

("DIB"). The matter was referred to the undersigned United States Magistrate Judge for Report

and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has

jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g) and 1283(c). Both parties submitted

motions for summary judgment. For the reasons set forth below, the Court recommends that

Plaintiff's motion for summary judgment be GRANTED IN PART AND DENIED IN PART

and the Defendant's motion for summary judgment be denied.

I.      **BACKGROUND**

    A.      **Procedural History**

On October 25, 2006, Plaintiff filed an application for DIB commencing on March 14,

2003. (Tr. 10, 231).[1] On January 2, 2009, Plaintiff amended the onset date of her disability from

March 14, 2003 to September 14, 2006. (Tr. 231). The Administrative Law Judge ("ALJ")

denied Plaintiff's claim on February 10, 2009. (Tr. 10-23). The ALJ found that Plaintiff was not

---

[1] Throughout this Report and Recommendation, this Court refers to the administrative record [Docket No. 5] for the
present case by the abbreviation "Tr."

disabled within the meaning of the Social Security Act.  Id.   Plaintiff sought review of the decision, but the Appeals Council denied review.  (Tr. 2-5).  The ALJ's decision therefore became the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

**B.      Factual History**

Plaintiff initially filed her claim in 2006 when she was 43 years old.  (Tr. 26).   She is a high school graduate.  (Tr. 32).   Prior to her alleged disability, Plaintiff worked full-time as a bus driver from 1996 to 2003.  (Tr. 163).   Plaintiff was involved in a car accident in 2003.  (Tr. 36).  During the car accident, Plaintiff suffered a head injury.  (Tr. 36-37).  After the accident, Plaintiff could no longer perform her job as a bus driver.  (Tr. 36).  However, in 2008, Plaintiff worked at Pam's Hallmark in Duluth one day a week for six months. (Tr. 29).  At the time of the hearing, Plaintiff testified that she lived with her husband and 24 year old daughter.  (Tr. 28).

Plaintiff stated at the hearing that she suffers from numerous medical problems including synovitis in her wrists and hands, neck pain, shoulder pain, fibromyalgia, and migraine headaches. (Tr. 41, 43, 45-48).  However, Plaintiff's migraines are the primary subject of this challenge to the ALJ's decision.  Plaintiff testified that she suffers from severe migraines at least once a week and usually goes to the emergency room for treatment at least once a month.  (Tr. 54).  According to Plaintiff, when suffering from a severe migraine, she throws up and is sensitive to light.  (Tr. 54).  Plaintiff stated that her migraines last up to six to eight hours during which she lies down with an eye mask on and asks to be left alone.  (Tr. 54).

Even with her health problems, Plaintiff declared that she is able to dress, bathe and take care of herself at home. (Tr. 35).  In addition, she admitted to doing some cooking, cleaning and laundry.  (Tr. 51).  Plaintiff noted that she does drive, but has problems remembering where she is going.  (Tr. 31-32).  Further, Plaintiff indicated that she does not drive after taking Imitrex for

her headaches because of the way it makes her feel.  (Tr. 55).  Although Plaintiff claimed she has many hobbies, she has trouble engaging in them due to her memory and health issues.  (Tr. 55)  However, if she has a headache, Plaintiff reported that she does not complete housework or engage in any of her hobbies, but instead stays in bed.  (Tr. 52).

### C.     Medical Evidence in the Record

Plaintiff's amended her onset of disability date to September 14, 2006.  (Tr. 231).  As such, only medical records from that date forward are included in the following overview.  Furthermore, since Plaintiff only challenges the ALJ's decision on the basis of his reasoning regarding her migraines and fibromyalgia, the following summation of her medical history only discusses those two conditions.

#### 1.  Migraine Headaches

Plaintiff's extensive migraine history begins with a visit to her primary care doctor, Dr. Luehr, on September 22, 2006 where he diagnosed her with migraine headaches.  (Tr. 290).  Dr. Luehr affirmed this diagnosis during subsequent appointments.  (Tr. 289, 355, 431-31, 535).

Dr. Holt was one of two neurologists primarily charged with controlling Plaintiff's migraines.  On November 6, 2006, Dr. Holt noted her history of migraine headaches and diagnosed her with transformed migraines on an ongoing basis (Tr. 304).  He prescribed Topamax and Inderal to treat her migraines.  (Tr. 304).  Dr. Holt subsequently renewed his diagnosis on December 2, 2006.  (Tr. 305).  One month later, on January 11, 2007, Dr. Holt concluded that competitive employment was not a possibility for Plaintiff because she suffers from migraines two to four times per week with prostration, nausea, photophobia, and sonophobia.  (Tr. 313).  Migraines would cause her to miss work one to four times per week.

(Tr. 313).  In reaching this conclusion, he noted that she suffered from chronic, transformed migraines that were poorly controlled by medication.  (Tr. 313).

In addition to Dr. Holt, neurologist Dr. Crisostomo treated Plaintiff for migraines.  On January 30, 2007, he diagnosed her with migraines and prescribed Keppra and Inderal with instructions to discontinue the Inderal in ten days.  (Tr. 350).  Dr. Crisostomos continued to diagnosis Plaintiff with migraines.  (Tr. 349, 370, 469). On March 5, 2007, Plaintiff told Dr. Crisostomos she was encouraged because in February she went nine days without having a migraine.  (Tr. 349).  However, two months later, Plaintiff complained that she was only having two days per week without headaches.  (Tr. 370).  Dr. Crisostomo agreed to let her try managing her migraines without medicine since Keppra did not seem to be helping. (Tr.  370). One year later, in June, 2008, Plaintiff returned to Dr. Crisostomo.  (Tr. 469).  She complained of worsening headaches with migraines three to five times per week.  (Tr. 469).  Dr. Crisostomo noted Plaintiff was not taking any medication for migraines except Topamax which was prescribed to treat fibromyalgia, but could also be used to treat migraines.  (Tr. 469).  Since Plaintiff wanted to rely on natural medicine, he recommended Migrelief and butterbur while noting that some of her previous medications may have been helping her.  (Tr. 469).  Again, Dr. Crisostomo diagnosed migraines without aura, intractable with muscle contractions.  (Tr. 469-470).

Plaintiff began seeing Dr. Sudak on March 26, 2008.  (Tr. 480).  At this time, Dr. Sudak indicated Plaintiff felt her migraines had not improved.  (Tr. 480).  Plaintiff continued to report suffering migraine headaches to Dr Sudak.  (Tr. 477).  Dr. Sudak noted that Fioricet proved helpful for migraines. (Tr. 477).  Dr. Sudak diagnosed Plaintiff with migraines and recommended Meclizine for nausea.  (Tr. 477, 480).

On August 25, 2008, Plaintiff saw Dr. Elliott for a pain management consultation. (Tr. 483). As to her migraines, Dr. Elliott stated Plaintiff complained of migraines two to three times per week. (Tr. 484). However, Dr. Elliott noted Plaintiff achieved a good response to Imitrex since the left shoulder repair and being on daily opioids including Lortab and Darvocet. (Tr. 484). Over the six weeks preceding the appointment, Plaintiff complained that her migraines occurred about once per week and Imitrex relieved the pain 80% of the time. (Tr. 484). When Imitrex did not work, Plaintiff took Fioricet with complete resolution of the headache. (Tr. 484). At the time of the appointment, Plaintiff experienced only one headache the preceding week which was completely resolved by Fioricet. (Tr. 484). Further, Dr. Elliott noted that Plaintiff felt her migraines were triggered by lack of food, lack of sleep, stress and pain. (Tr. 484). He diagnosed Plaintiff with migraines. (Tr. 487).

Plaintiff underwent a number of consultative evaluations. In January 2006, Dr. Dressel performed a psychological evaluation. (Tr. 316). Plaintiff reported to Dr. Dressel that she suffered from headaches 14 of the last 18 days. (Tr. 316). Six headaches were severe and eight were moderate. (Tr. 313). Plaintiff indicated Imitrex was not always sufficient for management of migraines. (Tr. 313). To alleviate migraines, Plaintiff also took Inderal and Darvocet. (Tr. 313). Still, Plaintiff reported to the hospital eight times during the year for migraines. (Tr. 313). Further, Plaintiff stated the side effects from her medication made her feel tired, sleepy and dizzy. (Tr. 313). Dr. Dressel diagnosed Plaintiff with Depressive Disorder Not Otherwise Specified with features of Anxiety. (Tr. 314, 320).

Dr. Unversaw, a state agency psychiatrist, completed a psychiatric review of Plaintiff on February 7, 2007. (Tr. 331). Dr. Unversaw found Plaintiff suffered from mild restrictions of daily living activities, mild difficulties maintaining social functioning and moderate difficulties

maintaining concentration, persistence, and pace. (Tr. 341). Further, Dr. Unversaw concluded Plaintiff had the ability to perform and remember simple tasks, but had some impairment in attention and concentration. (Tr. 347). Although Dr. Unversaw determined Plaintiff had sufficient social skills, Dr. Unversaw noted that she may struggle with stress on the job. (Tr. 347).

Dr. Toro provided a medical evaluation case analysis on January 23, 2007. (Tr. 330). He found Plaintiff suffered from migraines, which were usually controlled by Imitrex. (Tr. 330). In addition, he noted that Plaintiff took Topamax and Inderal for migraines. (Tr. 330). Dr. Toro indicated her neurological exam was normal. (Tr. 330). Even though her migraines occasionally required visits to the emergency room, Dr. Toro classified them as non-severe because they usually responded to Imitrex. (Tr. 330).

On April 27, 2007, a state medical agency doctor, Dr. Eames, reaffirmed a finding that Plaintiff's complaints were nonsevere. (Tr. 366). After examining Plaintiff's medical records, the doctor found that she suffered from migraines, but relied on her neurologist's opinion that migraines were typically controlled by Imitrex. (Tr. 366).

On August, 28, Plaintiff visited a mental health professional to deal more effectively with stress. (Tr. 444). Scott Poupore-Haat noted that Plaintiff understood that her migraines were related to stress and that she needed to deal better with stress to help minimize them. (Tr. 444). The next month, he explained that Plaintiff was experiencing increased stress which caused additional migraines. (Tr. 442). Plaintiff continued to see Scott Poupore-Hatt for stress management. (Tr. 440).

In addition to visits with doctors, Plaintiff's visits to the emergency room evince her history suffering from migraines. Plaintiff went to the emergency room with a migraine on

October 16, 2006.  (Tr. 282).  In 2007, Plaintiff presented to the emergency room for migraines six times.  (Tr. 352, 379, 383, 387, 391, 403).  The next year, emergency room doctors treated Plaintiff for migraines eight times.  (Tr. 494, 504, 508, 513, 517, 525, 526, 560).  Emergency room doctors treated her migraines with different combinations of Morphine, Toradol, Compazine, Ativan, Zofran, Benadryl, Phengran, Decadron, and Diluadid.  (Tr. 282, 352, 379, 383, 387, 391, 403, 494, 504, 508, 513, 517, 525, 526, 560).

### 2.  Fibromyalgia

On September 25, 2007, Plaintiff visited Dr. Khan complaining of pain all over her body. (Tr. 466).  Dr. Khan noted Plaintiff's pain became worse after switching from Topamax to Keppra for her migraines.  (Tr. 466).  Upon examination, Dr. Khan found Plaintiff to have 18 out of 18 trigger points for fibromyalgia.  (Tr. 467).  Since Topamax seemed to control her pain and could be used to treat fibromyalgia, Dr. Khan prescribed it to Plaintiff.  (Tr. 468).  Plaintiff saw Dr. Khan again on October 16, 2007.  (Tr. 464).  She complained of myalgias, but stated her overall pain from fibromyalgia was better since being on Topamax.  (Tr. 464).  Dr. Khan also prescribed Liboderm patches for pain over her trapezii, which were her most painful trigger points.  (Tr. 464).  Subsequently, Dr. Khan continued to prescribe Topamax for Plaintiff's fibromyalgia.  (Tr. 454, 546).  Subsequently, Dr. Elliott found Plaintiff suffered from fibromyalgia, but noted it was partially remitted with no pain attributable to it. (Tr. 484).

### D.     Evidence from the Vocational Expert

A vocational expert ("VE"), Edward Utitis, testified at the administrative hearing.  (Tr. 57).  The ALJ asked Utitis to consider what jobs a person could perform who suffered from neck pain, migraines, left shoulder pain, rheumatoid arthritis, some depression and fibromyalgia, who would be limited to light range lifting, not more than 20 pounds occasionally, and up to ten

pounds frequently, and unable to work around hazards. (Tr. 59). The ALJ further limited the question to only include jobs available to someone of Plaintiff's age and education level. In response to this hypothetical question, Utitis stated that such a person could not perform Plaintiff's previous work because a school bus driver is a semi-skilled position requiring medium strength. (Tr. 59). However, Utitis testified that Plaintiff could perform other jobs such as collator operator, folding machine operator, and many other similar occupations. (Tr. 59-60). Utitis confirmed that such jobs exist within the state of Minnesota. (Tr. 60).

Next, Plaintiff asked the VE whether a person who experienced multiple hospitalizations for migraines and suffered migraines rendering her unable to perform simple tasks and be confined to a bed for hours at a time one to two times a week could engage in full-time competitive employment. (Tr. 61). Utitis responded that such limitations were not consistent with full-time employment. (Tr. 61).

### E.     Third Party Observations

Plaintiff's husband, Don Carlson, completed a "Function Report-Adult (Third Party)" form supporting Plaintiff's claim. (Tr. 146-153). Mr. Carlson stated that Plaintiff was able to take care of herself, her home and the cooking on days without a headache. (Tr. 146). Additionally, Mr. Carlson stated that Plaintiff went outdoors on days she did not have a headache. (Tr. 148). Mr. Carlson reported Plaintiff went shopping two times per week for 20 minutes or less. (Tr. 148). Further, he maintained that she paid bills, counted change, handled a savings account, and used a checkbook with supervision. (Tr. 149-150). Mr. Carlson indicated Plaintiff enjoyed reading, watching TV, sewing and crafts. (Tr. 150). However, he stated she could only engage in her hobbies when her headaches allowed. (Tr. 150). He also indicated

Plaintiff usually spent all or part of the day in bed with a headache five out of seven days a week. (Tr. 146).

F.    The ALJ's Decision

Administrative Law Judge (ALJ) Roger Thomas, determined Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 22). In reaching his decision, the ALJ purported to apply the required five-step sequential analysis: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled a listed impairment; (4) whether the claimant had sufficient residual functional capacity (RFC) to return to her past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy. 20 C.F.R. § 404.1520(a)-(f).

At step one of the analysis, the ALJ determined that Plaintiff had not engaged in substantial work from March 14, 2003 through her date last insured of December 31, 2008. (Tr. 12). Next, the ALJ found that Plaintiff had severe impairments including degenerative disc disease of the cervical spine with chronic neck pain, migraine headaches, mild rheumatoid arthritis, and depression at step two. (Tr. 12). However, the ALJ declined to include fibromyalgia as a severe impairment because the record did not include evidence of positive trigger point tests as required for a diagnosis. (Tr. 13).

At step three, the ALJ found that Plaintiff's impairment or combinations of impairments did not meet or equal one of the listed impairments in 20 C.F.R., part 404, subpart P, appendix 1. (Tr. 18-19). At step four of the evaluation, the ALJ concluded that the claimant had the residual functional capacity ("RFC") to perform light work, which did not require working around hazards, and that could be limited using simple instructions. (Tr. 14). In addition, the work

could only involve superficial contact with others, lifting up to 20 pounds occasionally and 10 pounds frequently, and standing and/or walking up to six hours and sitting up to six hours in a day. (Tr. 14). The ALJ analyzed Plaintiff's RFC using a two step process. (Tr. 14). First, he determined whether there was an underlying medically determinable physical or mental impairment that could be reasonably expected to produce the claimant's pain or other symptoms. (Tr. 14). Second, once an underlying physical or mental impairment was identified, the ALJ evaluated the intensity, persistence and limiting effects of the claimant's symptoms to find out the extent to which the claimant's basic work activities are limited. (Tr. 14). During this analysis, if objective medical evidence did not substantiate the claimant's statements about intensity, persistence or symptoms, the ALJ made a finding on the credibility of Plaintiff's statements about the limiting effects of her impairments by considering the record as a whole. (Tr. 14).

Starting with the first prong of the step four analysis, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. 15). Turning to the second prong, the ALJ determined the claimant's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible because they were inconsistent with the RFC assessment. (Tr. 15). After discussing Plaintiff's other complaints, the ALJ evaluated Plaintiff's allegations that she suffered migraines up to two times per week. (Tr. 16). He found Plaintiff's migraines had improved by October 2008 and were generally caused by lack of food, lack of sleep, stress and pain which suggested Plaintiff could have prevented many of her headaches. (Tr. 16). In addition, her testimony of continuing migraines remains inconsistent with her treating physician's statement that her headaches were improved. Lastly,

the ALJ concluded that the inconsistency between claimant's subjective reports and the objective evidence in the record reduced her overall credibility. (Tr. 16).

In making his RFC finding, the ALJ considered the opinion of Dr. Holt, the claimant's treating physician, who found that Plaintiff was unable to engage in work because of her migraine headaches. (Tr. 17). However, the ALJ declined to place significant weight on his opinion because it was based solely on the claimant's subjective reports that she experienced headaches instead of objective evidence on the record demonstrating that she responded well to medication and that her migraines could be controlled by better sleeping and eating habits. (Tr. 17). Instead, the ALJ gave significant weight to a consultative psychological examination with Dr. Dressel. (Tr. 17). Dr. Dressel diagnosed Plaintiff with depressive disorder, not otherwise specified, with features of anxiety. (Tr. 17). However, Dr. Dressel did not find that Plaintiff was unable to work based on any psychological or mental impairments. (Tr. 16-17). Finally, the ALJ considered the opinion of Dr. Unversaw, the State Agency, non-examining psychologist. (Tr. 18). The ALJ gave Dr. Unversaw's opinion significant weight because he had an opportunity to review the claimant's medical records providing him a complete overview of the claimant's impairments and functional limitations. (Tr. 18). Dr. Unversaw noted that the claimant suffered no more than mild restrictions of activities of daily living, mild difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence and pace. (Tr. 18). The ALJ incorporated Dr. Unversaw's recommendations into his RFC finding. (Tr. 20).

In addition, when making his step four RFC determination, the ALJ established Plaintiff suffered only mild restrictions of activities of daily living in contrast to her subjective complaints of disability. (Tr. 18). The Plaintiff performed her own grooming and hygiene, cooked easy

meals, completed household chores and enjoyed walking and sewing. (Tr. 18). As far as social

functioning, Plaintiff had good relationships with her immediate and extended family and faced

no difficulty interacting with people. (Tr. 18-19). When analyzing Plaintiff's credibility, the

ALJ considered her sporadic work history which showed Plaintiff made variable wages and did

not work for many years. (Tr. 19). According to the ALJ, Plaintiff's work history proved factors

other than her medical problems impacted her decision not to work. (Tr. 19). Finally, the ALJ

found Plaintiff's lack of effort to find another job negatively impacted her credibility. (Tr. 19).

Lastly, at the fifth step of the analysis, the ALJ decided Plaintiff could not perform her

past work as a bus driver. (Tr. 20). Next, the ALJ analyzed whether work existed incorporating

all the limitations Plaintiff's health conditions required. (Tr. 20). The ALJ found Plaintiff could

perform unskilled work with a light level of exertion. Since bus drivers use medium levels of

exertion for their semi-skilled position, Plaintiff could not perform her prior job. (Tr. 20). After

considering Plaintiff's age, RFC, education and work experience, the ALJ relied on the

testimony of the VE to find Plaintiff capable of obtaining work that existed in significant

numbers in the economy. (Tr. 20). Thus, the ALJ concluded Plaintiff was not disabled as

defined in the Social Security Act.

## II.      STANDARD OF REVIEW

Congress imposed standards for determining whether a claimant is entitled to Social

Security disability benefits. "Disability" means "the inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment . . .

which has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A). To be eligible for benefits, an individual's impairments must be of

"such severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence in the record as a whole. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005). Substantial evidence means more than a scintilla, but less than a preponderance. Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009). The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings." Id. Rather, the court "must take into account whatever in the record fairly detracts from its weight." Id. (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474. 488 (1951)).

When reviewing the record for substantial evidence, the Court may not reverse the Commissioner's decision simply because substantial evidence exists to support the opposite conclusion. Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). Moreover, the Court may not substitute its own judgment for findings of fact for those of the administrative law judge. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Dew v. Comm'r of Social Sec., 2010 WL 3033779 at *16 (D. Minn. 2010) (quoting Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III.   DISCUSSION

In the present case, Plaintiff challenges the decision of the ALJ on three grounds.  First, Plaintiff argues the ALJ's decision is not supported by substantial evidence in record as a whole. Second, Plaintiff contends the ALJ failed to provide sufficient reasons for rejecting Plaintiff's treating physician's opinion and erred in heavily relying on the opinions of Dr. Dressler and Dr. Unversaw.  Lastly, Plaintiff asserts the ALJ's hypothetical questions posed to the vocational expert did not include all of Plaintiff's limitations.

### A.   Whether the ALJ's Decision is Based on Substantial Evidence on the Record as a Whole

### 1.   Consideration of Migraines

The ALJ determined that Plaintiff's migraines constituted a severe impairment that limited her ability to work.  (Tr. 12).  However, the ALJ also found that the Plaintiff's impairment did not equal or meet any medically listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13). As required, the ALJ proceeded to determine Plaintiff's RCF.  (Tr. 14). In making this decision, the ALJ determined that Plaintiff's impairments could reasonably be expected to cause her symptoms, but that Plaintiff's statements regarding the intensity, persistence and limiting effects of her migraine symptoms were neither credible nor supported by objective evidence.  (Tr. 15).  As such, the ALJ found Plaintiff able to do light work, defined as lifting up to 20 pounds occasionally and ten pounds frequently and standing or walking up to six hours and sitting up to six hours in an eight hour work day.  (Tr. 14).

Plaintiff makes a number of arguments supporting her claim that the ALJ's decision regarding her history of migraines was not based on substantial evidence. First, Plaintiff claims that the ALJ incorrectly found that her migraines were controlled by medication.  Second, Plaintiff argues the ALJ wrongly determined that the objective record did not support a finding

of disabling migraines. Third, Plaintiff alleges the ALJ improperly discredited her testimony because her subjective reports and the objective evidence on the record were inconsistent.

i.       **Whether Medication Controlled Plaintiff's Migraines**

The ALJ determined that Plaintiff's migraines were controlled by medication. In support of his decision, the ALJ pointed to two medical records. First, the ALJ relied on a medical record from Plaintiff's visit with Dr. Ciemins on November 15, 2005, where Dr. Ciemins noted Plaintiff got "fairly good control" of her migraines with Topamax, Inderal, and Imitrex. (Tr. 294). Second, the ALJ pointed to a visit to her doctor in October 2008 where she related that her headaches were improved and appeared to be related to not sleeping, not eating and stress. The ALJ found this record suggested Plaintiff could prevent migraines by using an appropriate eating and sleeping schedule.

Turning first to Plaintiff's visit with Dr. Ciemins, while undoubtedly this record lends support to the ALJ's argument that Plaintiff's migraines can be controlled by medicine, the doctor's visit took place on November 15, 2005, long before September 14, 2006, Plaintiff's amended disability onset date. As such, this record does not support the ALJ's assertion that Plaintiff's migraines were under control during her period of disability. Moreover, the ALJ's analysis fails to consider subsequent medical records, detailed more fully in the next section, showing Plaintiff continued to suffer from migraines throughout 2006, 2007 and 2008, even though she took medicine to control them. Specifically, in his letter explaining Plaintiff's disability, Dr. Holt stated, "[s]he has additionally been evaluated in this department by a locum tenens neurologist, a Dr. Vilnis Ciemens, at the Duluth Clinic on the 15th of November 2005. . . She had fairly good control with Topamax at the present time but had increasing difficulty by the

time I saw her." (Tr. 313). Dr. Holt's letter provides evidence that Plaintiff's migraines continued to deteriorate after she saw Dr. Ciemens.

That leaves the ALJ with evidence from the October 2008 visit with Dr. Elliott to support his finding that Plaintiff's migraines were treatable. At the onset, we note that the ALJ misstated the date of the doctor's visit. The visit was actually on August 25, 2008, not October 2008. In addition, the ALJ used the statements in the record out of context. The ALJ must consider all of the relevant evidence in context and may not misconstrue portions of the record to support his findings. See, Olson v. Shalala, 48 F.3d 321, 322 (8th Cir. 1995) (finding it improper for ALJ to take statements out of context); Reddick v. Chater, 157 F.3d 715, 722-23 (9th Cir. 1998) (it is impermissible for the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports"); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is not permitted to reach a conclusion "simply by isolating a specific quantum of supporting evidence"). Here, the ALJ pointed to the statements in the record which supported his decision rather than looking at the whole record. The document in question recorded Plaintiff's visit with Dr. Elliott, a pain management specialist. While the ALJ correctly noted that Dr. Elliott found that Plaintiff still had migraines but "generally with good response to Imitrex," he failed to consider the remainder of Dr. Elliott's sentence. (Tr. 484). As Dr. Elliott's full sentence stated, "[o]ver the last five years the headaches have increased to nearly daily headaches occurring 2-3 times per week but generally with good response to Imitrex since the left shoulder repair and being on daily opiods." (Tr. 484). Not only does this statement show Plaintiff continued to suffer migraines, but it also explains why Plaintiff's migraines significantly improved – she was taking daily opiods. Yet, the ALJ failed to consider this evidence in his decision.

In addition, Plaintiff reported to Dr. Elliott that she had at least one incapacitating headache per week even at the time of the appointment. (Tr. 484). Further, when she was on the opioids, Dr. Elliott noted that Imitrex only controlled her pain about 80% of the time. (Tr. 484). Indeed, the ALJ did not take into account that two months later, in November, Plaintiff's subjective reports in her headache diaries showed five incapacitating headaches that did not respond to medication. (Tr. 216). Furthermore, in December Plaintiff suffered from two incapacitating headaches that did not respond to medication. (Tr. 215). While objective medical evidence of Plaintiff's migraines following Dr. Elliott's August 2008 report is scare, Plaintiff subjectively continued to report migraines after the appointment and the record shows at least one trip to the emergency room in an attempt to relieve her symptoms. (Tr. 560-561).

In response, the Commissioner argues that Plaintiff stated a number of times that her medication was working beyond the instances cited by the ALJ. Particularly, the Commissioner states that in January 2007, Plaintiff told Dr. Crisostomos that Imitrex helped her headaches and informed Dr. Luehr that she had some success with Keppra. (Tr. 350-351, 372-73, 355-56). However, the Commissioner neglects to point out that four months later in May, 2007, Plaintiff reported to Dr. Crisostomos that Keppra did not seem to be working. (Tr. 370). Dr. Crisostomos agreed that she should discontinue taking it. (Tr. 370). In addition, while on Keppra, Plaintiff continued to complain of migraines. In February, Plaintiff complained of seven incapacitating headaches, none of which were completely relieved by medication. (Tr. 226). During her March 2007 visit with Dr. Luehr she complained of continuing migraines even while on Keppra. (Tr. 355). She reported seven incapacitating headaches with medication only completely relieving one headache in her March headache diary. (Tr. 225). Moreover, she went to the

emergency room twice for migraine treatment in March. (Tr. 352, 403). Similarly, in April she reported six incapacitating migraines with medication alleviating three of them. (Tr. 224).

Even when Plaintiff's was taking medication other than Keppra, numerous findings by doctors support her allegations that she continued to have migraines while on medication. During 2006 and early 2007, Plaintiff was taking Inderal and Topamax. Yet, she continued to complain of migraines. On September 22, 2006, Dr. Luehr diagnosed Plaintiff with migraines. (Tr. 290). He renewed this diagnosis on November 27, 2006. (Tr. 289). Doctors treated Plaintiff for migraines in the emergency room on October 16, 2006. (Tr. 282). On November 6, 2006, Dr. Holt diagnosed Plaintiff with transformed migraines on an ongoing basis. (Tr. 304). Likewise on December 2, 2006, Dr. Holt found her migraine history unchanged. (Tr. 305). One month later, Dr. Holt determined Plaintiff was unable to work due to her migraines which he described as chronic and transformed occurring two to four times per week. (Tr. 313). Dr. Holt noted her migraines were "chronic, intractable, unremitted and poorly controlled." (Tr. 313). Similarly, in January 2007, Plaintiff saw Dr. Dressel for a psychological evaluation. (Tr. 316). Dr. Dressel reported Plaintiff complained of headaches 14 of the last 18 days. (Tr. 316). Plaintiff subjectively noted in her headache diary that she suffered from three, six and five incapacitating headaches that did not respond to medication in November, December and January. (Tr. 286-88).

After being off medication from May through August, Plaintiff began taking Topamax again on September 24, 2007 for treatment of fibromyalgia. (Tr. 468). Topamax can also be used to treat migraines. While on Topamax, Plaintiff told Dr. Sudak that her migraines were about the same on March 26, 2008. (Tr. 508). Two days later, emergency room doctors treated her for another migraine. (Tr. 526-27). On April 19, 2008, Plaintiff again received emergency

room treatment for migraines. (Tr. 525). Dr. Luehr determined that Plaintiff continued to suffer from migraines in April 2008. (Tr. 535). The next month, on May 26, Plaintiff presented to the emergency room for treatment of a migraine. (Tr. 513-514). Emergency room doctors treated Plaintiff for a migraine on June 17, 2008. (Tr. 504). That same month, Plaintiff reported to Dr. Crisostomo that her migraines were getting worse. (Tr. 469). Since Plaintiff was only taking Topamax and did not want to take anything else, Dr. Crisostomo recommended natural remedies. (Tr. 469). Even though Plaintiff was taking Lortab and Darvocet after surgery, on July 13, 2008, Plaintiff received treatment for a migraine in the emergency room. (Tr. 494). On August 4, 2008, Dr. Sudak diagnosed Plaintiff with migraines and noted Plaintiff's migraines were about the same. (Tr. 477). The Phenergran she was taking for her migraines knocked her out and the Fioricet had to be taken twice per migraine. (Tr. 477). Dr. Elliott made the same diagnosis. (Tr. 484). The next month, Plaintiff was treated in the emergency room for a migraine (Tr. 560).

This evidence demonstrating that Plaintiff continued to have migraines while on medication detracts from the ALJ's finding that her migraines were easily treatable. At best, it seems that medication provided only partial and intermittent relief for Plaintiff's migraines. In addition, not only does this evidence show Plaintiff continued to suffer migraines while taking medication, but it also shows that doctors continued to change the medication she took in an effort to treat her migraines. If her medicine was working, the doctor would have no reason to prescribe Plaintiff so many new medications. However, the ALJ failed to consider extensive contrary evidence showing Plaintiff's migraines were not treatable or explain why he found the evidence unconvincing. See Slusser, 557 F.3d at 925 (finding court "must take into account whatever in the record fairly detracts from its weight").

Finally, the ALJ relied on Dr. Elliott's report to show that, in the ALJ's words, her headaches "appeared to be related to not sleeping or not eating, in addition to stress, suggesting that many of the claimant's headaches could have been prevented by appropriate sleeping and eating schedules." (Tr. 16). However, Dr. Elliott does not give his own medical opinion about whether sleeping better, eating regularly or reducing stress would alleviate Plaintiff's migraines. (Tr. 484). Instead, Plaintiff herself linked migraines to lack of food, lack of sleep and stress. (Tr. 484). Just because Plaintiff identified factors that seemed to trigger her migraines does not mean that avoiding them would relieve her migraines. Review of the record as a whole shows no doctor prescribed better sleeping, eating or stress relief as treatment for Plaintiff's migraines let alone suggested it could completely cure her migraines. The conclusion otherwise by the ALJ shows he was impermissibly attempting to independently diagnose and reach his own medical conclusion about what Plaintiff should have done to treat her migraines. Halsell v. Astrue, 357 Fed.Appx. 717, 722 (7th Cir. 2009). However, ALJs should be cautious that "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990).

Moreover, the record demonstrates that Plaintiff was treated at St. Luke's Mental Health Services from July 17, 2007 to October 23, 2007 with the goal of better managing her stress and her migraines. (Tr. 440-451). Even with mental health treatment, Plaintiff continued to complain of migraines. She told her medical provider on September 25, 2007 that her "[m]igraines are so intense that she just goes to the hospital for treatment. She has had four hospital trips in the last month." (Tr. 442). Still, the ALJ failed to consider this evidence. While the ALJ does not have to point to each piece of evidence in his opinion, he still must

"demonstrate that [he] evaluated all the evidence." Herbert v. Heckler, 738 F.2d 128, 130 (8th Cir. 1986).

The Commissioner cautions the Court not to impermissibly reweigh the evidence. (Def.'s Mem., p. 29) (citing Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006)). However, our analysis undertakes not to reweigh evidence, but rather to determine whether there is more than a mere scintilla of evidence to support the ALJ's contention as required. Slusser, 557 F.3d at 925. To do so, we must do more than merely "search the record for evidence supporting the findings." Id. After analyzing the evidence cited by the ALJ and combing the record for other evidence in support of his argument, this Court finds the ALJ's conclusion that Plaintiff's migraines responded to medication or self-treatment is not supported by substantial evidence on the whole.

### ii.       Objective Evidence of Migraines

While the ALJ determined that Plaintiff's migraines constituted a medically determinable physical impairment, he concluded that Plaintiff's statements concerning the intensity, duration and limiting effects of her symptoms were not supported by objective evidence. (Tr. 15). Specifically, the ALJ concluded that objective evidence shows that Plaintiff's migraines could be treated through self-prevention and medication. However, as discussed above, substantial evidence does not support that finding.

Beyond his conclusion that Plaintiff's migraines were treatable, the ALJ's decision is unclear about whether other objective evidence detracts from Plaintiff's allegations of incapacitating migraines. Although the ALJ did not question that Plaintiff suffered from migraines, he did argue that the objective evidence does not support her subjective complaints of the intensity, duration and limiting effects of migraines. (Tr. 15). For the sake of completeness, the Court will briefly address Plaintiff's assignment of error to the ALJ's finding in this regard.

Because migraines constitute a subjective complaint, objective evidence conclusively showing whether a person suffers from them is impossible to find. Courts have noted that migraines headaches cannot be diagnosed or confirmed through laboratory or diagnostic techniques. Duncan v. Astrue, 2008 WL 111158 at *6 (E.D. N.C. Jan. 8, 2008); Wiltz v. Barnhart, 484 F.Supp.2d 524, 532 (W.D. La. 2006). However, courts also find that migraines do not need to be proven through objective laboratory tests or clinical findings. Thompson v. Barnhart, 493 F.Supp.2d 1206, 1215 (S.D. Ala. 2007); Ortega v. Chater, 933 F.Supp. 1071, 1075 (S.D. Fla. 1996). Instead, doctors diagnose migraines through medical signs and symptoms such as nausea, vomiting, photophobia, sensitivity to sound. Duncan, 2008 WL 111158 at *6, Ortega, 933 F.Supp. at 1075. Here, Plaintiff's doctors continuously found that she suffered from migraines and experienced migraine symptoms, such as nausea and sensitivity to light and sound. (Tr. 289, 290, 304, 305, 313, 330, 350, 355, 366, 370, 430-31, 469-70, 477, 480, 483, 535). In fact, the record does not contain any statements by doctors questioning the frequency or severity of Plaintiff's migraine headaches. See Stebbins v. Barnhart, 2003 WL 23200371 at *2 (W.D. Wis. Oct. 21, 2003) (finding it important that ALJ did not point to one doctor who questioned the existence or severity of migraines). Nor did any doctor suggest Plaintiff was lying or not credible when discussing her migraines. The ALJ cannot point to any objective evidence in the record to support his own conclusion that Plaintiff's migraines were not as severe or as frequent as she claimed just as this Court has noted that the record is bare of objective evidence finding Plaintiff's migraines are completely treatable by medication.

### iii.    Plaintiff's Credibility

The ALJ found that Plaintiff's subjective complaints about the intensity, persistence and limiting effect of her migraines were not credible. (Tr. 15). In his decision, the ALJ reasoned

that Plaintiff's participation in many daily activities was inconsistent with a claim of disability. (Tr. 18).   In addition, the ALJ considered her work history and found that Plaintiff only worked sporadically and for nominal wages. According to the ALJ, this showed that factors beyond Plaintiff's medical impairments influenced her work history.  (Tr. 19).  Further, the ALJ reasoned that her lack of effort to find other work reduced her credibility.  (Tr. 19).

Typically, credibility findings are for the ALJ to make.  Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006).  Still, since credibility determinations are findings of fact, the determination must be supported by substantial evidence on the record as a whole.  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007).  To meet this standard, the ALJ must make an express credibility determination, set forth the inconsistencies in the record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered, and must explain the reasons for discrediting the testimony.  Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004).

When making a credibility determination ultimately used to evaluate subjective symptoms, the ALJ must consider the Plaintiff's prior work record and the observations of third parties and of physicians, relating to (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Polaski v. Heckler, 729 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ must take each factor into account, but does not need to discuss how each factor relates to plaintiff's credibility.  Id.

Initially, this Court recognizes that the ALJ's decision is compliant with the requirements of Polaski on its face because it discusses a number of the Polaski factors.  See Moraine v. Social Sec. Admin., 695 F.Supp.2d 925, 958 (D. Minn. 2010).  However, the Court finds that the ALJ's

decision is not ultimately supported by substantial evidence in the record on the whole because the ALJ ignored a multitude of evidence supporting Plaintiff's subjective complaints of debilitating migraines.  The ALJ's decision rested on two arguments.  First, the ALJ pointed to the inconsistencies between the objective medical evidence and her subjective complaints, which has already been discussed in the Court's analysis above. Second, the ALJ pointed to Plaintiff's daily activities and found inconsistencies between Plaintiff's daily activities and her alleged levels of pain and functional limitation.

Turning to the ALJ's reliance on Plaintiff's daily activities, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th Cir.1996).  Yet, the ability to engage in activities provides little or no support for the finding that a claimant can perform full-time competitive work.  Moraine, 695 F.Supp.2d at 961.  A claimant does not have to prove "that he or she is bedridden or completely helpless to be found disabled." Payton v. Shalala, 35 F.3d 684, 687 n. 6 (8th Cir. 1994).  Here, the ALJ found Plaintiff took care of her own grooming, sewed, did some cooking, went on walks, used the computer, cleaned the bathroom, did laundry, drove herself to appointments and the grocery store, and socialized with her family.  (Tr. 18).  However, Plaintiff also testified that she was only able to do these things when she did not have a headache. (Tr. 55).  Her husband, in his "Function Report-Adult (Third Party)," corroborated her statements.  (Tr. 146-151). However, the ALJ did not consider the fact that Plaintiff could only take care of herself and perform her hobbies when she was migraine free. Further, he did not mention her husband's report at all.  Thus, the ALJ has not demonstrated that all relevant evidence was considered and evaluated as required.  Masterson, 363 F.3d 731.  Further, he has not explained away this conflicting evidence.  See Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991).

The Court finds the reasoning in <u>Yawitz v. Weinberger</u>, 498 F.2d 956 (8th Cir. 1974) persuasive. In <u>Yawitz</u>, the plaintiff alleged disability from severe migraine headaches. The ALJ determined the plaintiff could engage in substantial gainful activity because he drove, went on cross-country camping trips and did some fix-up and repair work around the house. <u>Yawitz</u>, 498 F.2d at 961. The court overturned the decision finding that the ALJ "totally ignored all the evidence concerning the limited amount of driving that Yawitz does; that frequently Yawitz and his wife did not travel at all on any given day or only a short distance because of his headaches; that Yawitz worked around the house only when he was physically able to; that frequently he was not able to do anything . . . ." <u>Id</u>.; <u>see also</u>, <u>Johnson v. Sec'y of Health and Human Servs.</u>, 872 F.2d 810, 814 (8th Cir. 1989) (finding that ALJ improperly failed to consider that plaintiff was totally prevented from participating in any activity for the duration of the headache). Like in <u>Yawitz</u>, the ALJ in the present case "totally ignored" that Plaintiff cannot engage in any activities when she has a migraine. <u>See e.g.</u>, <u>Yawitz</u>, 498 F.2d at 961. Thus, Plaintiff's ability, in the case now before the Court, to perform some limited household duties and hobbies when not experiencing migraines is not evidence that she is able to work full time "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir.1982).[2]

**2.      Consideration of Fibromyalgia**

---

[2] In addition, the ALJ relied upon Plaintiff's sporadic work history as evidence that she lacked credibility. The Court relies upon <u>Cox v. Barnhart</u>, 345 F.3d 606 (8th Cir. 2003). In that case, the court found the ALJ's reliance on the Plaintiff's work history misplaced. During a six year period, she worked several jobs and had several employment gaps. <u>Cox</u>, 345 F.3d at 611. Ultimately, the Court determined that the ALJ did not have enough information available to allow him to conclude that the plaintiff was not motivated to work. <u>Id</u>. Similarly, Plaintiff in the present case worked as a bus driver full time for a number of years. Prior to working as a bus driver, Plaintiff worked a number of part time jobs. Thus, there is not enough evidence for the ALJ to find that the Plaintiff was not motivated to work. Further, the record shows that Plaintiff worked part-time as a cashier at Hallmark in 2008, but quit because she missed five out of 18 scheduled days over six months due to incapacitating migraines. (Tr. 32, 194). However, the ALJ did not even consider this evidence in his analysis.

The ALJ found Plaintiff was diagnosed with fibromyalgia. Yet, he concluded fibromyalgia was not a severe impairment because "the record is absent of trigger point tests or enumerations of tenderpoints that would substantiate this diagnosis." (Tr. 13). In addition, the ALJ noted that the claimant had not received any treatment "specifically for fibromyalgia syndrome." (Tr. 13). Therefore, the ALJ failed to include Plaintiff's fibromyalgia in his RFC analysis. Plaintiff argues this determination is not supported by substantial evidence.

At step two of the five step process used to determine whether a claimant is disabled, the ALJ must consider whether the Plaintiff "has a medically severe impairment." Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006). The Eighth Circuit has previously recognized that fibromyalgia is a chronic condition which is difficult to diagnose and may be considered a medically severe impairment. Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005).

In this case, the ALJ failed to consider fibromyalgia as an impairment because no trigger point tests showed she suffered from the disease and because Plaintiff was not treated for the disease. Even though the ALJ does not explicitly say so in his opinion, he seems to be saying that Plaintiff's allegations of fibromyalgia are not supported by objective evidence in the record. However, the ALJ completely failed to discuss the substantial medical evidence outlining Plaintiff's fibromyalgia diagnosis and subsequent treatment. On September 25, 2007, Dr. Khan found Plaintiff to have 18 out of 18 trigger points for fibromyalgia and diagnosed her with the condition. (Tr. 467). Plaintiff's pain started only when she quit taking Topamax for her migraines. (Tr. 468). Since Topamax can also be used to treat fibromyalgia and Plaintiff's pain seemed under control when she was taking it, Dr. Khan prescribed it to control her pain. (Tr. 468). The next month, Plaintiff told Dr. Khan her fibromyalgia was better after being on Topamax. (Tr. 464). He prescribed her Liboderm patches for the pain in her trapezii, which

were her most painful trigger points. (Tr. 464). Dr. Khan continued to prescribe Topamax for her fibromyalgia at subsequent visits. (Tr. 454, 539, 546). While the evidence may support a conclusion that Plaintiff's fibromyalgia was possibly treatable, it does not support a conclusion that Plaintiff was never treated for fibromyalgia. Further, other doctors reference Plaintiff's fibromyalgia. (Tr. 469, 483, 535). Garza, 397 F.3d at 1089 (finding it improper when ALJ did not specifically discuss other physician's subsequent references to fibromyalgia in his conclusion that claimant's fibromyalgia was not supported by objective evidence). Thus, the Court directs the ALJ to consider the entire record of Plaintiff's fibromyalgia diagnosis and treatment to determine whether it is an impairment that must be considered in his RFC analysis.

**B.** **Whether the ALJ Did Not Properly Give the Opinion of Plaintiff's Treating Physician Controlling Weight**

In his analysis, the ALJ declined to give Plaintiff's treating physician, Dr. Holt, significant weight because his determination that Plaintiff suffers from migraine headaches rendering her unable to work was not supported by objective evidence in the record. (Tr. 17). The ALJ opined that Dr. Holt's opinion "appears to be based solely on the claimant's subjective reports of experiencing headaches, rather than on the objective evidence in the record which shows that the claimant's headaches have responded well to medication and are tied, at least in part, to circumstances within the claimant's control." Plaintiff challenges the ALJ's finding because she contends that the record supports Dr. Holt's conclusion.

A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.' " Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Id. When a treating

physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002). Thus, an ALJ may disregard a treating physician's medical opinion, and adopt the consulting physician's contrary opinion, when the treating physician's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the record as a whole. See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997). The ALJ can also discount the treating physician's opinion if other assessments are supported by better, or more thorough, medical evidence. Id.

As discussed above, this Court finds that the ALJ's conclusion that the objective evidence does not support Plaintiff's allegations of incapacitating migraines is not supported by substantial evidence on the record as a whole. The ALJ's independent conclusion that Plaintiff's migraines are treatable by both medication and self-treatment underpins his entire analysis, including his decision not to give the opinion of Plaintiff's treating physician, Dr. Holt, significant weight. The ALJ may give little weight to a treating physician's opinion if that opinion rests solely on the claimant's complaints and is unsupported by objective medical evidence. Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993). However, as analyzed thoroughly above, the record in this case, when viewed as a whole, establishes that Dr. Holt's conclusions are consistent with other medical evidence. Substantial medical evidence supports Dr. Holt's finding that Plaintiff suffers from incapacitating migraines that are not readily treatable.

In addition, when a treating physician's opinion is not given controlling weight, the ALJ must consider other factors to determine the weight it should be given. 20 C.F.R. § 404.1527(d). These factors include the length of the treatment relationship, the nature and extent of the

treatment relationship, the degree to which the medical source supports the opinion, the consistency of the opinion with the record as a whole, the specialization of the source in the area addressed by the opinion, and other factors deemed to support the opinion. 20 C.F.R. § 404.1527(d)(2)(i)-(iii), (d)(3)-(6). Here, an analysis of several of these factors support granting greater weight to Dr. Holt's assessment. First, Dr. Holt treated Plaintiff specifically for her migraines and examined her twice in November 2006 and December 2006. (Tr. 303-306). Second, as discussed above, the medical records as a whole support Dr. Holt's opinion that Plaintiff's migraines were not treatable. Third, Dr.Holt's specialization as a neurologist supports granting greater weight to his opinion. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (finding that a treating specialist's opinion is entitled to greater weight than the opinions of non-specialists where the specialist's opinion is supported by clinical data). Migraine headaches generally are treated by neurologists. Stebbins v. Barnhart, 2003 WL 23200371 at *13 (W.D. Wis. Oct. 21, 2003). As such, a neurologist's opinion regarding migraines should be granted greater weight. This Court does not need to decide whether the ALJ should have given Dr. Holt's opinion controlling weight, it is sufficient to note that, according to the criteria for evaluating a treating source's opinion under 20 C.F.R. § 404.1527(d), Dr. Holt's assessment was entitled to more weight than the ALJ gave it or at least an explanation for the ALJ's determination to completely dismiss it.

The ALJ offers no reason why Dr. Holt's opinion should not be given substantial weight besides his own lay conclusions that the objective evidence showed Plaintiff's migraines were treatable. Nor does he cite to the opinion of any other doctor who treated Plaintiff's migraines who disagrees with Dr. Holt's opinion. Further, it is unclear which opinion, other than his own, he relies on to find that Plaintiff's migraines are not severe and do not significantly limit her

ability to work. In his written decision, the ALJ relies heavily on Dr. Dressel and Dr. Unversaw, who are both psychologists. When an ALJ refuses to grant controlling weight to a treating physician's opinion, the ALJ must further evaluate the weight to give other medical opinions, such as those of Dr. Dressel and Dr. Unversaw, under the framework described in 20 C.F.R. § 404.1527(d). Under that regulation, the ALJ considers a number of factors in according weight to medical opinions such as: (1) whether the source has examined the claimant; (2) the length of the treatment relationship and the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the quantity of evidence in support of the opinion; (5) the consistency of the opinion with the record as a whole; and (6) whether the source is a specialist. Lehnartz v. Barnhart, 142 Fed.Appx. 939, 942 (8th Cir. 2005).

However, in the present case, neither Dr. Dressel nor Dr. Unversaw made a medical conclusion about whether Plaintiff's migraines were severe. (Tr. 315-320, 331-347 ). Dr. Dressel noted that Plaintiff reported that she suffered severe migraines and suffered from six severe migraines in the last 18 days. (Tr. 316). But, Dr. Dressel did not make an independent medical determination of whether or not Plaintiff actually suffered from migraines. In fact, Dr. Dressel deferred to Plaintiff's medical provider for the diagnosis of any Axis III impairments which include general medical conditions such as migraines.[3] (Tr. 320). Rather, it appears from the record that both pyschologists only considered her mental and psychiatric impairments instead of her physical impairments. Thus, the ALJ cannot rely solely on their determinations to discount the existence of a physical and neurological impairment such as a migraine. Since the

---

[3] Diagnosis of mental disorders requires a multiaxial evaluation. Axis I refers to the individual's primary clinical disorders that will be the foci of treatment; Axis II refers to personality or developmental disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V refers to the clinician's assessment of an individual's level of functioning. See, American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed.1994), pp. 25-32.

ALJ failed to properly weigh and assess the opinions of Dr. Holt, this will necessarily require that all the medical evidence be reweighed on remand, including the opinions of Dr. Unversaw and Dr. Dressel.

**C. Whether the ALJ's Hypothetical Question to the Vocational Expert Was Correct**

At steps four and five, the Commissioner assesses an individual's RFC.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  RFC is defined as the most a claimant can do despite the limitations of the individual's impairments.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  Based on the RFC, the ALJ then determines what jobs are available for the claimant while considering his age, education and previous work experience.  Fenton v. Apfel, 149 F.3d 907, 910 (8th Cir. 1998).  Usually, the Commissioner bases his finding on what types of jobs are available to the claimant by posing hypothetical questions to a vocational expert.  Id.  The questions posed to the vocational expert must fairly reflect the abilities and impairments of the claimant as evidenced by the record.  Morse v. Shalala, 32 F.3d 1228, 1230 (8th Cir. 1994).  Reponses to hypothetical questions that do not include all the claimant's impairments, limitations, and restrictions, or is otherwise inadequate cannot constitute substantial evidence to support the ALJ's conclusion.  Greene v . Sullivan, 923 F.2d 99, 101 (8th Cir. 1991).

The ALJ's question to the Vocational Expert in the instant case did not reference limitations produced by migraines.  (Tr. 58-60).  In our analysis above, we found that the ALJ erroneously rejected the medical evidence on the record by improperly determining that Plaintiff's migraines are treatable without considering contrary evidence.  We also determined that the ALJ unfairly undermined Plaintiff credibility, improperly rejected her diagnosis of fibromyalgia, and wrongly declined to place great weight on Dr. Holt's opinion.  These errors seriously undercut the validity of other areas of the ALJ's decision.   Since we concluded above

that the ALJ's decision is not based on substantial evidence on the whole, "we have no confidence in the reliability of the RFC upon which the ALJ based his decision." <u>Snead v. Barnhart</u>, 360 F.3d 834, 839 (8th Cir. 2004). Where the ALJ's RFC analysis was in error, as in this case, it cannot be the basis for a proper hypothetical question to a vocational expert. <u>Cox v. Apfel</u>, 160 F.3d 1203, 1207 (8th Cir. 1998). However, we decline to hypothesize on what types of limitations the ALJ should include in the RFC on remand. We do caution, however, that if the ALJ finds that Plaintiff's migraines further limit her RFC, the hypothetical question to the vocational expert must include the symptoms of migraines, including the fact that Plaintiff may suffer from nausea, vomiting, and may have to miss work unexpectedly since the nature of migraines are such that they are unforeseeable. <u>See</u>, <u>Serson v. Barnhart</u>, 2003 WL 22002433 at *2 (D. Minn. Aug. 19, 2003) (finding that hypothetical question must include migraine effects including vomiting and nausea). For these reasons, the Court directs the ALJ to reconsider his hypothetical question in light of this decision and any new conclusions he makes on remand.

**IT IS HEREBY RECOMMENDED THAT:**

1. Plaintiff's Motion for Summary Judgment be GRANTED IN PART for remand for further proceedings consistent with this Report and Recommendation, in accordance with sentence four of 42 U.S.C. § 405(g), and DENIED IN PART for award of benefits (Doc. No. 16);

2. Defendant's Motion for Summary Judgment (Doc. No. 19) be DENIED.

s/
Leo. I. Brisbois
U.S. MAGISTRATE JUDGE

Dated: November 8, 2010

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by November 22, 2010**, a writing that

specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.